UCARTER, C.J.
WCC was born on January 31, 1996. He was taken from his mother, DC, and placed in state custody in May 1996 because she was providing him inadequate food and shelter. He has lived in foster homes for the past five years. In July 1999 the trial court terminated DC’s parental rights and certified WCC as adoptable.[2] Because the State[3] failed to prove DC had failed to comply with her case plan, on March 31, 2000, this court reversed that judgment and remanded the case to the trial court to develop a plan for continued state custody with the foster family with whom the child had been residing, subject to visitation by the child’s mother.[4] We noted that our decision did not mean that “termination and adoption will never be an option for him.” On February 6, 2001, after several interim hearings and changes, the trial court approved a permanent plan of adoption with monthly supervised visitation. DC appeals.
FACTUAL AND PROCEDURAL BACKGROUND
After the July 1999 judgment of termination and while the appeal was pending in this court, the State placed WCC with a potential adoptive parent, CC. His former foster mother, RC, refused any further contact with him at that time. A hearing was scheduled for May 2, 2000, while a rehearing application was pending with this court. The hearing was continued because Dr. Scott Butler, a counselor who had been treating WCC for several months, was unable to testify. Counsel for DC pointed out to the trial court that Dr. Butler’s report was based on a goal of adoption, which was contrary to the directive of this court. The trial court suggested to counsel for the State that she make Dr. Butler aware of the legal posture of the case before the next hearing.
The trial court held a case review hearing June 6, 2000. Dr. Butler was offered as an expert in mental health counseling, in particular as to children. On voir dire he testified that he has a Ph.D. in counseling and is licensed by the state of Louisiana as a | -¡professional counselor. He provides counseling both to children in long-term foster care and those in potential adoption placements. Part of his counseling services includes making recommendations regarding visitation between the child and the biological parent. He is also the executive director of a nonprofit state-licensed adoption agency. He was asked by the Office of Community Services (OCS) to provide counseling to WCC when he was moved from one foster home to another. He had been treating WCC for approximately five months at the time of this hearing.
OCS asked Dr. Butler to assess whether WCC’s behavior was out of the norm for his age and whether WCC’s behavior was related to continued contact with DC while he remained in foster care. He testified that, in his opinion, continued contact with DC was not in WCC’s best interest. DC’s counsel objected to this line of questioning because of this court’s directive to continue visitation, but after the State’s counsel pointed out that visitation is always subject *218 to review, the trial court overruled the objection.
Dr. Butler testified that based on his review of an OCS report relating WCC’s behavior after visits with DC and summarizing the reports of several psychologists who had evaluated DC, it was his opinion that visits with her should be terminated until he was older and more emotionally developed. Dr. Butler stated that the chief behavioral problem WCC was having after visits with DC was defecating in the living room.[5]
The State asked that WCC’s case management plan be changed to a goal of adoption and visitation be terminated. The trial court felt our decision bound it to maintain WCC in foster care until he showed improvements from therapy and started school. The court also felt our opinion obligated him to order visitation with DC. Since Dr. Butler’s opinion that visitation should be discontinued was based on second-hand knowledge, the trial court ordered Dr. Butler to supervise two visits between WCC and [4PC, to evaluate DC, and to give his impressions on the visitations to the court at a hearing to be held two months later.
The next hearing was held in August 2000. Terrilynn Bowe, an OCS caseworker, testified that WCC’s foster mother reported that after the visits with DC, WCC slept for extended periods of time, curling up and appearing exhausted and withdrawn; that he played with fire and set fire in his room immediately following the visits; and that he stated he did not want to visit DC any more.
Dr. Butler testified regarding the two visits he supervised and his meetings with DC after the visits. DC’s counsel stipulated to Dr. Butler’s qualifications as a counselor but objected to his testifying on the issue of visitation, implying that he was biased in favor of adoption. Dr. Butler testified he had been referred only five cases by OCS, and in those cases he provided counseling to children and their families in foster care, to biological parents, and to those in adoption placements. DC’s counsel also objected to Dr. Butler’s testimony because, in his opinion, this court’s opinion was that visitation was in WCC’s best interest and he did not think the State should be allowed to attempt to disprove that. The trial court overruled the objections, stating the court desired Dr. Butler’s testimony to help it determine what type of visitation was in WCC’s best interest at that time.
The supervised visits between DC and WCC were held at Dr. Butler’s office in Mandeville. He testified it was clear WCC did not want to be in the same room with DC; he avoided both physical and eye contact with her. Forty minutes into the first visit he ran to the door and said, “I want to go to my mommy,” referring to his potential adoptive mother, CC. Although WCC normally was able to express himself emotionally, giving and receiving hugs, even with people he did not know, he refused to give DC a hug or goodbye kiss and clung to CC’s leg. After the visits, he *219 experienced crying spells, urinated on the floor, set fires, clung emotionally to CC, and demonstrated insecurity with his current placement by telling CC, “I do love you. Please don’t let me go.” Dr. Butler testified that WCC had emotionally bonded with CC and his foster siblings and that continued visits with DC would undermine that bonding process and adversely affect WCC. He stated that while DC loves her son, she acknowledged that, “If he don’t Iswant to be here, he don’t want to be with me, then he shouldn’t have to be made to be with me.”
Lesley Beard, the CASA volunteer for WCC, testified she had visited with WCC on several occasions, including once after he left a visit with Dr. Butler. She had also visited with DC at DC’s home. She stated DC loves her son, and it is obvious she wants to visit with him. She recommended, however, that the visits between DC and WCC be stopped because of “what’s going on with [WCC] after he visits with the therapist and with [DC].”
The trial court then ordered that visitation be suspended and that a psychologist evaluate WCC. Another hearing was scheduled one month later, on September 5, 2000. At that hearing, counsel for the State reported that DC and WCC had been evaluated by a licensed psychologist, Dr. Salcedo. The parties stipulated to monthly supervised visits with the parameters to be set by Dr. Butler.
Another hearing was held October 31, 2000. Dania Fandal, a caseworker with OCS, testified. She stated that the consensus of the OCS staffing team was that adoption is the preferable placement plan for WCC, but the agency had established a case plan on September 20 to reassess the possibility of DC reunifying with WCC. As part of the plan, DC was to participate in typical parenting activities with WCC, including going to the bus stop twice daily at the times and place WCC would be getting on and off the bus if he was living with her and attending Head Start classes. Head Start personnel reported to OCS whether DC came to the bus stop and whether her behavior was appropriate. Those personnel reported that between September 20 and October 16, 2000, DC missed only 3 afternoons, but she came only 6 mornings out of 15. They also reported that several times she was inappropriately dressed and came with people who appeared to have been drinking. Fandal also testified that both DC and the man she lives with, NM, had tested positive for cocaine and had been referred to Slidell Substance Abuse Clinic.
Dr. Butler testified regarding the visits he supervised between DC and WCC. The first was at DC’s home. He reported that in the kitchen of the three-room house there were gasoline and tools that were accessible to WCC. An unidentified man came | ¿hito the house, spoke to no one, but sat there during the entire visit. Three other men stood outside and smoked under the carport, which was littered with empty beer bottles. DC gave WCC a book sack of toys, which kept him occupied for a while. She went into the bedroom to watch television. While she was watching television, WCC wandered to the screen door, and a man opened it and allowed WCC to go outside. Dr. Butler had to make DC aware that WCC was no longer in the house.
The second visit was at Dr. Butler’s office. Dr. Butler had DC and NM arrive early. DC told him she had taken care of an eight to nine-month-old child for two nights, but she did not know the child’s last name. She told him she learned nothing from her parenting classes and would rather have been sleeping. When CC arrived with WCC and left him in the room with Dr. Butler, DC, and NM, he said, “I *220 want to be with my mommy,” and left the room to go back to CC in the waiting area. When he was returned to the room, he said he would stay only if the door was left open. He kissed DC when asked, but then he walked out and went back to CC again. After that, DC said, “If he don’t want to be here, he don’t have to be here.”
Dr. Butler stated that in his opinion the short-term visits (two hours or less) were not in WCC’s best interest; they cause him emotional damage, and longer visits would be even worse. For 24 to 48 hours after the visits, WCC becomes very clingy and insecure about having CC leave his sight, he cries, and he is much more emotional. He further opined that DC was incapable of taking care of WCC’s basic needs during a home visit of less than two hours, and he could foresee no kind of training or counseling that would enable her to do so.
DC testified that she had gone to the Slidell Substance Abuse Clinic the morning of the hearing and that she had been going to substance abuse treatment “ever since [she] was a kid.” Later, however, she testified she had never used any illegal drugs and she had never seen NM use drugs.
She stated she had slept through part of the home visitation because “there wasn’t — really nothing to do. [WCC] didn’t do nothing but sit there, color, watch TV and stuff.” When asked about WCC not wanting to visit her, she replied, “I got to look |7out for my child be in — interest. If my — if I feel like my child don’t want to come, he ain’t got to see me.”
Fandal testified that OCS had never changed the long-term goal from adoption to long-term foster care, even after this court’s earlier decision, but it did implement a visitation schedule and additional services in an attempt to determine if reunification was possible. She stated that the case plan OCS had developed was extensive and provided a great number of services, and she asked the court to give DC six months under the case plan to attempt to show she could care for WCC. Services provided included the State installing a telephone for her and paying her phone bill, involving her in all of WCC’s doctor visits and Head Start meetings, and her caseworker devoting extra time to her to make sure she understood what was required under her case plan.
The trial judge then amended the case plan to “this hybrid thing” of long-term foster care with reunification. Visitation was continued with the understanding that it could be suspended if it became too upsetting for the child.
The last hearing was held on February 6, 2001. Lynette Doby, case manager for St. Tammany OCS, testified DC was referred to Slidell Substance Abuse clinic, which was within walking distance of her home, on October 17 after a positive screening for cocaine on October 9. She went on November 1 but did not complete the assessment. She went back on November 6, completed the assessment, and went to one meeting on November 13. A counselor at the clinic called OCS and said DC was not participating at all; DC had called and said she was quitting the program. According to Doby, DC’s reason for leaving the program was that “the people there were messy, and she didn’t want her business in the streets.”
Doby testified DC also tested positive for cocaine in December 2000 and January and February of 2001, all on days on which she had visitation with WCC. She also refused to take the drug screen on five occasions, and NM refused to be tested as well.
In addition to her failure to remain drug free, DC had also failed to maintain stable *221 housing. She and NM had a domestic dispute in early January, and NM told her she could not live with him any more. She slept on the streets one night, on the porch of the house another, and with a cousin a third. OCS referred her to Slidell Housing ^Authority and to a shelter, but she did not follow up on the recommendations. Instead, she moved back in NM’s house while he was in the hospital. NM was hospitalized after he fell and broke his hip while trying to break up a fight between DC and her aunt and was still in the hospital at the time of the hearing.
Doby further testified that DC had failed to attend any Head Start meetings and WCC’s doctor’s appointment because she did not have any transportation. She was also inconsistent at coming to the bus stop, which was within walking distance of her home.
In Doby’s opinion, WCC would be at substantial risk of serious harm if returned to DC because of the domestic violence situation and the substance abuse problem. Doby stated the agency’s recommendation was to change the goal to adoption so it could once again prepare a case for termination. Long-term foster care was not considered in the child’s best interest because he is five years old. Such care can lead to multiple placements, and he is currently in a potential adoptive home. Doby testified that Dr. Butler agreed that the plan should be changed to adoption and that visitation should be terminated.
Ramona Case, CASA supervisor for this case, testified that she attended visits between DC and WCC in November, December, and January. Those visits were held in a park, at a mall, and at DC’s home. DC arranged for a friend and a cousin to give her rides to the park and the mall.
Lesley Beard, the CASA volunteer appointed to this case, also testified. She had attended the last visit between DC and WCC at Dr. Butler’s office, five days before the hearing. Beard, a nurse, stated DC looked tired, as if she did not feel well. DC kept her head down and her jacket on. Although Beard did not feel DC was a danger to the child during a supervised visit, she recommended adoption instead of long-term foster care because she felt that at the age of five, he needed some stability and permanency in his life.
Beard gave the following description of the lack of interaction between DC and WCC during the visit. DC had purchased a birthday cake for WCC and also brought him a bag of food from Taco Bell. WCC walked into the room, and, without speaking to RPC or making eye contact with her, took the bag. At one point they played together with Lego blocks. WCC asked DC to build a house for him. But DC became engrossed in playing with the Legos, and when WCC tried to add a block to the house DC was building, she told him not to because it was her house. After that, he played with the blocks by himself.
The trial court stated that this court’s opinion did not preclude adoption. In light of the mother’s substance abuse and failure to comply with the case plan, the court approved a permanent plan of adoption with monthly supervised visitation.
ANALYSIS
DC contends the trial court erred in failing to follow “the mandate” of this court by changing WCC’s permanent plan to adoption. DC further contends she has not been given a fair chance to visit with her child, that almost every visit was conducted in an oppressive atmosphere, and that her every move was under critical scrutiny. She asks that our decision of March 2000 be implemented with instructions to permit visitation “in a more congenial atmosphere.”
*222 Our review of the record, as outlined above, shows that the trial court and the State were well aware of this court’s March 2000 decision and took steps to comply with it while still keeping the best interest of the child in the forefront. Despite the treating counselor’s recommendations and the testimony of the CASA workers and OCS caseworkers that visitation was having a negative emotional effect on WCC, the trial court felt bound to order visitation in accordance with this court’s opinion. Visitation was held at Dr. Butler’s office, at a McDonald’s restaurant, at a park, at a mall, and at DC’s home. All of these visits were closely supervised because DC demonstrated her inability to properly care for WCC on her own, as well as her refusal to get help for her substance abuse problem, coming to visits while under the influence of cocaine. Continued supervised visitation was ordered even after the permanent plan was changed to adoption. We find no error in the trial court’s handling of the visitation.
As for DC’s contention that the trial court failed to comply with this court’s “mandate” in our March 2000 opinion, we made it clear that adoption was still an option. The March 2000 opinion was based on facts developed at a hearing in July 1999. |inAlmost two years have passed since then, and circumstances have changed. WCC is now five years old. He is living with someone who wants to adopt him. Many of his developmental delays have been rectified. And while DC was complying with her case plan at the time of the July 1999 hearing, she is not now. Instead, she is using cocaine and refusing to get treatment at a clinic with in walking distance of her home.
Children’s Code article 702 D sets a list of priorities for determining the permanent plan for the child that is the most appropriate and in the child’s best interest: (1) reunification; (2) adoption; (3) placement with a legal guardian; (4) placement with a relative; or (5) placement in the least restrictive, most family-like alternative permanent living arrangement (long-term foster care). Reunification has proven impossible. Long-term foster care is the lowest on the priority list. Adoption is the highest priority choice that is possible for this child. In light of these facts, we find no error in the trial court’s permanency planning order setting a goal of adoption.
For the foregoing reasons, the judgment of the trial court approving a permanent plan of adoption with supervised visitation is affirmed at DC’s costs.
AFFIRMED.

. WCC's father's parental rights were also terminated in the July 1999 judgment; he did not oppose the termination.

. The State of Louisiana, Department of Social Services, is the state agency involved herein.

. State of Louisiana in the Interest of W.C.C., 00-0467 (La.App. 1st Cir.3/31/00)(unpublished).

. DC’s counsel questioned Dr. Butler as to whether RC, WCC’s foster mother at that time, had other foster children in her home and whether they were experiencing the same sort of defecation problems after visiting with their biological parents. Dr. Butler said he was aware RC had prior foster children but had never asked her about them having defecation problems. DC's counsel then asked hypothetically if previous foster children had the same sort of problem, would this show something was wrong with the foster home and not the parental visits. Dr. Butler replied that this was possible. However, despite his best efforts in questioning OCS caseworkers, DC's counsel was never able to establish that any prior foster children in RC’s care had such problems.